*Cameron Darnell Lewis v. State of Maryland*, No. 28, September Term 2022. Opinion by Woodward, J.

**CRIMINAL LAW – RENDITION OF JURY'S VERDICT – FAILURE TO USE WORDS "GUILTY" AND "NOT GUILTY" DOES NOT RENDER THE VERDICT A "NULLITY"**

**CRIMINAL LAW – *VOIR DIRE* – IMPROPER COMPOUND QUESTION – TRIAL COURT'S FINAL, "CATCH-ALL" QUESTION IS NOT AN IMPROPER COMPOUND QUESTION**

Cameron Darnell Lewis, appellant, was arrested after fleeing a traffic stop and was charged with, among other offenses, possession of fentanyl and cocaine with the intent to distribute, altering physical evidence, and attempting to elude uniformed police by failing to stop. Another man, Damontrall Miles, was in the vehicle and was also arrested. Appellant's case went to trial, and, during *voir dire*, defense counsel requested that the trial court ask the venire whether they had a medical condition that would prevent them from performing their duties as a juror. The court declined to ask the requested question and determined that the question fell under the court's final "catch-all" question, which was, "Do you know of any reason whatsoever why you cannot sit as a juror in this case and render a fair and impartial verdict based on the evidence and the law?"

At trial, the trial court accepted the arresting officer as "an expert in the fields of slang or street terminologies, controlled dangerous substances and street value of controlled dangerous substances." The officer then testified as to the meaning of slang terms in text messages located on two phones recovered from appellant's vehicle. After the close of the evidence, the court gave an accomplice liability instruction to the jury on the alternate theory that appellant was an accomplice to Miles. Appellant argued that the instruction was not generated by the evidence, but the court declined to withdraw the instruction.

After the jury reached a verdict, the foreperson announced it in open court. The verdict sheet, which had been submitted by defense counsel, read: "Do you find that the State has proven its case beyond a reasonable doubt as to:" and then listed each of the eighteen counts before the jury. Below each count were spaces for a "yes" or "no" answer. The foreperson said "yes" for all counts. The jury was then polled, to which all jurors affirmed the verdict, and the verdict was then hearkened by the clerk.

Appellant noted a timely appeal, challenging (1) the rendition of the jury's verdict, (2) the failure to ask defense counsel's proposed question during *voir dire* and the trial court's final "catch-all" question, (3) the accomplice liability jury instruction, and (4) the acceptance of the arresting officer as an expert in slang terms for narcotics.

**Held:** Affirmed.

On appeal, the Appellate Court of Maryland first discussed the rendition of the jury's verdict. As a preliminary matter, the Court addressed the uncertainty in existing case law regarding whether challenges to the rendition of a jury's verdict are subject to waiver or the requirement of preservation. The Court ultimately determined that, due to such uncertainty, it would address appellant's challenge to the verdict despite the lack of preservation. The Court then discussed the three steps in the rendition of a jury's verdict: (1) oral announcement of the verdict, (2) polling of the jury, and (3) hearkening of the verdict. The Court explained that *Givens v. State*, 76 Md. 485 (1893), and its progeny, which was relied upon by appellant, does not require that the words "guilty" or "not guilty" be used in the oral announcement of the verdict. In addition, the Court held that the use of "yes" instead of "guilty" did not create confusion as to the meaning of the foreperson's words and satisfied the purpose of the oral announcement of the verdict. Regarding the hearkening of the verdict, the Court concluded that the use of the words "guilty" or "not guilty" again were not required by *Givens*, and that the important substantive aspect of the hearkening was that all the jurors assented to the verdict in the manner stated by the foreperson, which happened in the instant case.

The Court next addressed the *voir dire* issue and whether the trial court's final "catch-all" question was an improper compound question. The Court first held that asking whether any juror had a "medical condition" was not asking about a mandatory subject of inquiry (i.e., whether any juror has a certified disability that prevents him or her from providing satisfactory jury service) and was fairly covered by the court's final question. Next, the Court held that the issue of whether the court's final question was an improper compound question was not preserved for appellate review. Even if it was preserved, however, the Court determined that the question was not an improper compound question because the two parts to the question were separate and independent of each other. Finally, the Court held that, even if the trial judge erred in not asking defense counsel's proposed question, the error was harmless.

Turning to the third issue on appeal, the accomplice liability instruction, the Court held that evidence from both before and after the traffic stop was relevant to determining whether appellant was acting as an accomplice to Miles. Considering all relevant evidence, the Court concluded that there was sufficient evidence to give the accomplice liability instruction to the jury as an alternate theory of criminal culpability. Finally, the Court addressed the trial court's acceptance of the arresting officer as an expert and held that the officer had sufficient training and experience to testify about "slang or street terminologies, controlled dangerous substances and street value of controlled dangerous substances."

Circuit Court for Kent County
Case No.: C-14-CR-21-000024

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 28

September Term, 2022

_____

CAMERON DARNELL LEWIS

v.

STATE OF MARYLAND

_____

Arthur,
Friedman,
Woodward, Patrick, L.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Woodward, J.
Concurring Opinion by Friedman, J.

_____

Filed: June 27, 2024

*Kehoe, Stephen, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Cameron Darnell Lewis, appellant, was arrested on January 29, 2021, and charged with multiple offenses, including possession of fentanyl and cocaine with the intent to distribute, altering physical evidence, and attempting to elude uniformed police by failing to stop. Later, appellant was indicted on twenty-two counts. After a jury trial in the Circuit Court for Kent County on November 29 and 30, 2021, appellant was convicted on all of the eighteen counts that were submitted to the jury.[1] The court sentenced appellant to a total term of forty-one years' imprisonment, with all but ten years suspended, and supervised probation for a period of five years upon release.

Appellant presents four questions for our review on appeal, which we have rephrased slightly:[2]

1.     Did the court err in accepting the jury's verdict?

2.     Did the court abuse its discretion by declining to ask defense counsel's requested *voir dire* question?

3.     Did the court abuse its discretion by instructing the jury on accomplice liability?

---

[1] Counts 1, 3, and 7 were entered *nolle prosequi* by the State after the jury was sworn and count 15 was entered *nolle prosequi* by the State during the State's case-in-chief.

[2] Appellant originally phrased his questions as:

1. Did the court err in accepting the jury's verdict?
2. Did the court err in failing to ask a mandatory voir dire question?
3. Did the court err and abuse its discretion in instructing the jury on accomplice liability?
4. Did the court err and abuse its discretion in accepting a State's witness as an expert in "the fields of slang or street terminologies, controlled dangerous substances and street value of controlled dangerous substances"?

4.      Did the court abuse its discretion in accepting a State's witness as an expert in "the fields of slang or street terminologies, controlled dangerous substances and street value of controlled dangerous substances"?

For the following reasons, we shall affirm the judgments of the circuit court.

## BACKGROUND

On January 29, 2021, at approximately 2:00 p.m., Deputy David Nolan of the Kent County Sheriff's Office was on routine patrol in the area of Routes 20 and 21 near Chestertown, Kent County, Maryland. Deputy Nolan was parked at an abandoned store when he was approached by a person who was concerned about a vehicle traveling on Route 20 because the person could smell marijuana coming from the vehicle. The person advised Deputy Nolan that the vehicle was a light blue Honda car with a Delaware license plate traveling east on Route 20 toward Chestertown.

Deputy Nolan proceeded in the direction of the vehicle and found a matching vehicle within minutes. Deputy Nolan conducted a registration check of the vehicle, which showed that the license plate was registered to a Chevy Cavalier. Deputy Nolan then conducted a traffic stop, and the vehicle pulled over. As Deputy Nolan exited his patrol car and got about halfway to the stopped vehicle, the vehicle fled from the stop location.

Deputy Nolan ran back to his patrol car and radioed other officers that the vehicle was fleeing the scene. As Deputy Nolan engaged in pursuit, he observed a bag fly out of the vehicle. The bag "looked like a sandwich bag," appeared to have some weight to it, and had "something lightly colored in it." Upon later review of the police car's video camera, the bag flew out of the passenger window. Deputy Nolan radioed the location of the bag, and Lieutenant Harry Kettner of the Sheriff's Office responded to that area. Ultimately,

2

Deputy Nolan stopped the vehicle and identified appellant as the driver. Another person was in the vehicle, and he was later identified as Damontrall Miles.

Appellant was searched, and Deputy Nolan retrieved money from appellant's pants pocket totaling $403.00. The vehicle was searched, and a digital scale with white residue on it was recovered in the open center console of the vehicle in front of the automatic shifter, as well as an iPhone, two Alcatel flip phones, and an eTalk flip phone. No contraband was found on either appellant or Miles.

Meanwhile, Lieutenant Kettner went to the described location and observed capsules on the shoulder of the road that had an off-white powder type substance inside. Lieutenant Kettner, using gloves, put the capsules in an evidence envelope. Lieutenant Kettner also observed two clear plastic bags on the shoulder of the road that contained a white powder substance. Lieutenant Kettner placed the bags in the same envelope as the capsules. Lieutenant Kettner then went to the scene of the stop with the suspected controlled dangerous substances and gave them to Deputy Nolan.

Appellant was arrested and subsequently indicted on twenty-two counts, eighteen of which were submitted to the jury: Counts 2. Possession with Intent to Distribute of Narcotic Fentanyl; 4. Possession with Intent to Distribute of Narcotic Crack Cocaine; 5. Possession with Intent to Distribute of Narcotic Powder Cocaine; 6. Altering Physical Evidence in Criminal Proceeding; 8. Possession of Fentanyl; 9. Possession of Crack Cocaine; 10. Possession of Powder Cocaine; 11. Possession of Controlled Dangerous Substance ("CDS") Paraphernalia (Clear Capsules); 12. Possession of CDS Paraphernalia (Clear Plastic Bags); 13. Displaying Registration Plates Issued for Other Vehicle; 14.

Operating an Unregistered Motor Vehicle on Highway; 16. Speeding; 17. Negligent Driving; 18. Reckless Driving; 19. Failure to Drive Right of Center; 20. Attempting to Elude Uniformed Police by Failing to Stop; 21. Eluding an Official Police Vehicle by Failing to Stop; and 22. Driving without Current Tags.

After a trial on November 29 and 30, 2021, the jury found appellant guilty on all 18 counts. On February 11, 2022, the court sentenced appellant to a total term of forty-one years' imprisonment, with all but ten years suspended, and supervised probation for a period of five years upon release. On March 4, 2022, appellant filed his notice of appeal. We shall provide additional facts as necessary for the resolution of the questions presented.

## DISCUSSION

### I. Rendition of the Jury's Verdict

#### A. Facts

On November 30, 2021, the trial court received the jury's verdict in open court. The verdict sheet, which had been submitted by defense counsel,[3] set forth at the beginning:

#### JURY VERDICT SHEET

(1) Do you find that the State has proven its case beyond a reasonable doubt as to:

---

[3] The State argues extensively in its brief that appellant's challenge to the rendition of the verdict was not preserved for appellate review because of defense counsel's submission of the verdict form and the lack of any objection to the announcement, polling, or hearkening of the verdict. Appellant responds that the requirement of preservation does not apply because a defective verdict is a nullity. Our review of the case law indicates that there is a lack of certainty as to whether an alleged defect in the rendition of a jury's verdict is or is not subject to waiver or the requirement of preservation. *See Jones v. State*, 384 Md. 669, 686 (2005) (although the State argued that Jones did not preserve for appeal the issue of
Continued

4

COUNT TWO: CDS POSSESSION WITH THE INTENT TO DIST. NARC. FENTYL

_____        _____
YES                            NO

COUNT FOUR: CDS POSSESSION WITH THE INTENT TO DIST. NARC. CRACK COCAINE

_____        _____
YES                             NO

The verdict sheet then listed all of the remaining counts submitted to the jury in the same manner. On the returned verdict sheet, the jury indicated "yes" as to each of the counts. The announcement of the verdict went as follows:

> THE COURT: It is my understanding that you all have a verdict; is that correct?
>
> (Chorus of yeses.)
>
> THE COURT: All right. Madam Clerk, please take the verdict.
>
> THE CLERK: Members of the jury, are you agreed upon your verdict?
>
> (Chorus of yes, we have.)

---

whether the verdict was illegal, our Supreme Court did not address the issue); *State v. Santiago*, 412 Md. 28, 41 (2009) (the State argued that Santiago's failure to request that the jury be polled or object to the clerk's failure to hearken the verdict constituted a waiver on appeal; however, the Supreme Court held that "[t]he defect in this case was not subject to waiver[]" and that "[t]he failure to hearken the verdict rendered the verdict a nullity."); *Smith v. State*, 299 Md. 158 (1984) (although the Supreme Court noted Smith's failure to object to the foreperson's request to be polled a second time, waiver or preservation was not raised by the State or addressed by the Court); *Givens v. State*, 76 Md. 485 (1893) (waiver or preservation was not raised by the State or addressed by the Supreme Court); *Ogundipe v. State*, 424 Md. 58, 72 (2011) (although Ogundipe did not object to the verdict when it was rendered, the Supreme Court did not address whether the issue was properly preserved). In light of such uncertainty, this Court will address appellant's challenge to the rendition of the jury's verdict.

THE CLERK: Who shall say for you?

(Chorus of Madam Foreperson.)

THE COURT: Thank you.

UNIDENTIFIED SPEAKER: We have a teacher in this courtroom.

THE CLERK: Members of the jury, look upon the Defendant at the bar, what say you as to Count II, CDS Possession with the Intent to Distribute Narcotic Fentanyl.

MADAM FOREPERSON: Yes.

THE COURT: Guilty or not guilty. Does it say yes? Okay. So I don't have a copy in front of me. My fault. Go ahead.

THE CLERK: Count IV, CDS Possession with the Intent to Distribute Narcotic Crack Cocaine.

MADAM FOREPERSON: Yes.

All eighteen counts were announced by the foreperson in the same fashion. The court then proceeded to ask about the polling of the jury:

THE COURT: All right. Does anybody want the jury polled?

[DEFENSE COUNSEL]: Yes, please.

[PROSECUTOR]: No, Your Honor.

THE COURT: May we poll the jury, please.

THE CLERK: Seat No. 2, Juror No. 251, is her verdict your verdict?

JUROR NO. 251: Yes.

Each juror, other than the foreperson, was polled in the same manner, with the same response of "yes." The court then told the clerk to proceed with the hearkening of the verdict:

THE COURT: You may harken the verdict, please.

THE CLERK: Members of the jury, harken unto your verdict as the Court has recorded it. Your Foreman has said that Cameron Lewis –

THE COURT: Said that you find that the State has proven the case beyond a reasonable doubt as to, that's why I was confused.

THE CLERK: Count II, CDS Possession with the Intent to Distribute Narcotic Fentanyl, yes.

The clerk hearkened the verdict using the same form for each count, asking the jury at the end whether the verdict was correct, and the jury collectively affirmed the verdict. No objection was made by the defendant during the announcement of the verdict, the polling of the jury, or the hearkening of the verdict.

## B. Standard of Review

Our review of the rendition of a "jury verdict in a criminal case is '*de novo,* considering the totality of the circumstances.'" *Jones v. State*, 173 Md. App. 430, 451 (2007) (quoting *Caldwell v. State,* 164 Md. App. 612, 643 (2005)); *see also Simms v. State*, 240 Md. App. 606, 619 (2019); *Teixeira v. State*, 213 Md. App. 664, 668 (2013).

## C. The Law

Under Article 21 of the Maryland Declaration of Rights, every person has a right "to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." Md. Const. Decl. of Rts. art. 21. The procedure for returning a verdict in a criminal trial in Maryland is governed by Maryland Rule 4-327. Section (a) of the rule provides that "[t]he verdict of a jury shall be unanimous and shall be returned in open court." Md. Rule 4-327(a). Further, on the request of either party or on the court's own

7

initiative, "the jury shall be polled after it has returned a verdict and before it is discharged. If the sworn jurors do not unanimously concur in the verdict, the court may direct the jury to retire for further deliberation, or may discharge the jury if satisfied that a unanimous verdict cannot be reached." Md. Rule 4-327(e).

In *State v. Santiago*, 412 Md. 28, 40 (2009), the Supreme Court of Maryland stated that the rendition of a jury's verdict has three distinct procedures: "(1) oral announcement of the verdict, (2) unanimity, except that a defendant may waive the requirement of unanimity and that he has an absolute right to poll the jury, [and] (3) after polling, the traditional third step is to hearken the verdict." "[E]ither hearkening or polling is the final third step, depending upon the circumstances of the case." *Id.* Hearkening and polling are conducted to "secure certainty and accuracy, and to enable a jury to correct a verdict, which they have mistaken, or which their foreman has improperly delivered." *Jones v. State*, 384 Md. 669, 684 (2005) (internal quotation marks omitted). "[A] jury verdict, rendered and announced in open court, that is neither polled nor hearkened is not properly recorded and is therefore a nullity." *Santiago*, 412 Md. at 32.

**D. Analysis**

  *i. Oral Announcement of the Verdict*

In *Givens v. State*, 76 Md. 485, 486 (1893), the jury announced its verdict of guilty in open court but was discharged before the jurors were hearkened to their verdict. The Maryland Supreme Court stated that "[t]he sole question, then, is whether this omission by the clerk in a criminal case is such an error as to entitle a party to a reversal of the judgment and the granting of a new trial." *Id.*

8

The Court observed at the outset:

> Now, it is admitted that it has been the invariable practice in the court where the appellant was tried, and the uniform practice in the courts of Maryland, for the clerk to call upon the jury to hearken to their verdict, when they return to the court to render it.
> And while it may be a matter of form and practice, yet it is a juridical form; and matters of form when they become established, and are supported by reasons of justice and propriety, are regarded as matters of substance.

*Id.* The Court then set forth the procedure for the rendition of verdicts that, "according to both the English practice and that in this country, is substantially and formally as follows:"

> When the jury have come to a unanimous determination with respect to their verdict, they return to the box to deliver it. The clerk then calls them over, by their names, and asks them whether they agree on this verdict, to which they reply in the affirmative. He then demands who shall say for them, to which they answer, their foreman. This being done, he desires the prisoner to hold up his right hand, and addresses them: 'Look upon the prisoner at the bar; How say you, is he guilty of the matter whereof he stands indicted or not guilty?' The foreman then answers guilty or not guilty, as the verdict may be. The officer then writes the word 'guilty' or 'not guilty' as the verdict is, on the record and again addresses the jury: Hearken to your verdict, as the court hath recorded it. You say that —— is guilty (or not guilty) of the matter whereof he stands indicted, and so say you all.

*Id.* at 487 (quotation marks omitted).

According to the Court, the purpose of a jury hearkening to its verdict "is to secure certainty and accuracy, and to enable the jury to correct a verdict, which they have mistaken, or which their foreman has improperly delivered[.]" *Id.* at 488. The Court concluded that, because "it has been the uniform practice in this State, in criminal cases, to observe this form in the rendition of verdicts, the practice should be continued and not changed. And as the [appellant] in this case was denied this right, we shall reverse the judgment and award a new trial." *Id.*

9

Appellant first argues that the announcement of the verdict in this case is a nullity because "[i]n gross deviation from the form that is a matter of substance, the foreperson's verdict did not include a single use of 'guilty' or 'not guilty'; no form of the root word 'guilt' was mentioned at all." Appellant contends that *Givens* provides the "required form" of the return of a jury's verdict, which involves the foreperson saying either "guilty" or "not guilty." In response, the State argues that, although the return of a jury verdict requires an oral announcement in open court, "neither Rule 4-327 nor the caselaw requires that the verdict be announced in a particular way. Nor do they specify that the foreperson utter the word 'Guilty.'" According to the State, *Givens* does not "mandate the proper announcement of a verdict by using the word, 'Guilty,'" but rather "addressed a complaint that the jury had not *hearkened* the verdict." (Emphasis in original).

Appellant is correct that "[t]he procedure in the rendition of verdicts[]" set forth in *Givens* uses the words "guilty" and "not guilty". *Givens*, however, does not mandate the use of specific words in the oral announcement of a verdict, nor does *Givens* indicate in any way that the failure to use those specific words renders the verdict a "nullity." The "sole" issue in *Givens* was whether the clerk's omission of having the jury hearken to its verdict resulted in a reversal of the judgment and the granting of a new trial. 76 Md. at 486. No issue was raised or decided by the Court regarding the propriety of using words other than "guilty" or "not guilty" in the oral announcement of the verdict. Moreover, Rule 4-327 does not specify any procedure, or litany, to be used for announcing the verdict "in open court." Finally, we believe that if our Supreme Court had intended that the trial courts use certain words and phrases for the oral announcement of a verdict, and that failure to do

10

so would render the verdict invalid, the Court would have said so in *Givens* or in a subsequent case. Appellant has not pointed us to any such case, and we have found none.

Appellant next argues that "[a]n indeterminate 'yes' is no substitute for a definitive 'guilty[,]'" because "'yes' . . . could mean any number of things." The State counters that the "yes" answers "were the culmination of a simple chain of reasoning:" if the jury found that the State proved a charge beyond a reasonable doubt, appellant was guilty; if the State did not prove a charge beyond a reasonable doubt, appellant was not guilty; and "[t]he jury was asked on the defense-submitted verdict sheet whether the State had proven each charge beyond a reasonable doubt as to each charge and answered 'yes' with respect to each count." Therefore, according to the State, "[i]t logically and necessarily follows that the jury's verdict was that [appellant] was guilty of each crime charged."

The purpose of an oral announcement of a verdict in open court is two-fold. First, the oral announcement enables the defendant to exercise the right to poll the jury to ensure the verdict's unanimity. *Jones*, 384 Md. at 684. Second, "orally announcing each count of the verdict prevents possible confusion during polling and hearkening where there are multiple counts considered by the jury[.]" *Id.* at 684-85. Further, to prevent possible confusion there must be a clear articulation of the jury's verdict as to each charge. *See id.* A foreperson's statement of "guilty" or "not guilty" to a charge when read aloud easily satisfies such purpose and is commonly employed by trial courts of this State.

The words "guilty" and "not guilty," however, are not the only words that can clearly convey a jury's verdict. Here, prior to their deliberations, the jurors were instructed by the trial court that "the State has the burden of proving the guilt of the Defendant beyond

11

a reasonable doubt[,]" and that if the jurors were "not satisfied with the Defendant's guilt to that extent for each and every element of each crime charged, then reasonable doubt exists and the Defendant must be found not guilty of that crime." Then, as set forth above, the Jury Verdict Sheet asked the jurors: "Do you find that the State has proven its case beyond a reasonable doubt as to:" and then listed each charge with a space for the jury to respond "yes" or "no" to that question. In this context, a marking of "yes" to a particular charge indicated a verdict of "guilty," and a marking of "no" indicated a verdict of "not guilty." Therefore, we conclude that when the jury foreperson said "yes" to each charge during the oral announcement, she clearly meant "guilty."

Finally, relying on *Ogundipe v. State*, 424 Md. 58, 72 (2011), appellant asserts that, even though the verdict sheet stated, "Do you find that the State has proven its case beyond a reasonable doubt as to[,]" "[t]he verdict sheet cannot be used to fill in the blanks because the contents of the verdict sheet do not constitute the jury's verdict." (Internal quotation marks omitted). The State answers that "the verdict sheet supported a properly announced verdict[]" and that this Court "should reject [appellant's] effort to elevate form over substance in arguing" that the verdict sheet cannot clarify the meaning of the verdict.

In *Ogundipe*, our Supreme Court addressed the issue of whether the signed verdict sheet constituted the jury's verdict. *Id*. at 68. There, the verdict sheet specified, and the trial judge so instructed, that for each first degree charge, the jury was to consider the second degree charge only if the jury's answer to the corresponding first degree charge was "not guilty." *Id.* at 66. Instead, after marking each of the five first degree charges as "guilty," the jury marked the corresponding second degree charge as "not guilty." *Id.* at 65.

12

Nevertheless, during the oral announcement of the verdict, the clerk did not ask the foreperson to recite the jury verdict for the second degree charge where the jury found the appellant guilty of the corresponding first degree charge. *Id.* at 67. The jury was hearkened and polled to the verdict as orally announced in open court. *Id.* at 65.

On appeal, the appellant argued that the verdict sheet constituted an inconsistent verdict with that which was orally announced. *Id.* at 67. Our Supreme Court rejected the appellant's argument, holding:

> [I]n the present case, any questions on the verdict sheet that were not announced orally in court cannot be considered verdicts in themselves. The verdict sheet is merely a tool used to aid the jury in reaching its verdict; it therefore does not bind the jury or the court to its contents.

*Id.* at 72-73.

In the instant case, unlike *Ogundipe*, there was no inconsistency between the verdict as set forth on the Jury Verdict Sheet and as orally announced by the jury foreperson. Indeed, they were identical. In other words, there is no contention here that the verdict sheet constitutes the jury's verdict, as opposed to the orally announced verdict. At most, the Jury Verdict Sheet provides context for the meaning of the foreperson's response of "yes" to each charge as read by the clerk, and thus is "a tool used to aid the jury in reaching its verdict." *Id.*

In conclusion, we have not found a case in any other jurisdiction that has addressed the issue before us. We note, however, that some courts in other jurisdictions have tried cases involving verdict sheets that state "yes" and "no" and have not disapproved of them. *See State v. Barbour*, 229 N.C. App. 635, 639-40 (2013) (involving the use of "yes" and

13

"no" on a verdict sheet for robbery and murder); *United States v. McCourty*, 562 F.3d 458, 465-66 (2d Cir. 2009) (involving the use of "yes" and "no" on a verdict sheet in response to the question "[h]as the government proved beyond a reasonable doubt that the defendant possessed with the intent to distribute more than five grams of crack"); *State v. Biegenwald*, 106 N.J. 13, 55-57 (1987) (involving the use of "yes" and "no" on a verdict sheet in response to questions about whether the jury had found beyond a reasonable doubt that aggravating and mitigating factors existed).

### ii. Polling of the Jury

Appellant argues that the polling of the jury "did nothing more than recapitulate the defective form of the announcement of the verdict and, thus, did nothing to cure the defective verdict." The State responds that the jury was properly polled, as appellant requested, and the polling established the unanimity of the jury's verdict.

The second step of the rendition of a jury verdict is the polling of the jury. *Santiago*, 412 Md. at 40. "A defendant has the absolute right to poll the jury[.]" *Jones*, 384 Md. at 683. "In order to exercise the right to poll, the defendant must request to poll the jury." *Id.* In *Smith v. State*, the Maryland Supreme Court stated that "[t]he polling provides a means of establishing that the verdict was with the unanimous consent of the jurors." 299 Md. 158, 166 (1984). "The underlying requirement of a final verdict is that it be unanimous." *Id.* at 163.

Here, appellant requested the polling of the jury, and the clerk polled the jury by confirming with each juror that his or her verdict was the same as the one announced by the foreperson. Appellant does not argue that the form of the polling itself was defective or

14

that the polling would have been insufficient had the verdict been valid; instead, appellant simply argues that the polling of the jury "did nothing to cure the defective verdict." Because we have determined that the oral announcement of the verdict by the foreperson was not defective, we conclude that the polling of the jury was proper.

### iii. Hearkening of the Verdict

Turning now to the third step in the rendition of the verdict, the hearkening of the verdict, appellant contends that the hearkening did not cure the defective verdict because the form of hearkening given to the jury was not the form required by *Givens.* According to appellant, *Givens* states that the hearkening of the verdict is a matter of substance, not just form. We are not persuaded.

In *Givens*, our Supreme Court stated that the form of hearkening is "substantially and formally" that the clerk "addresses the jury: Hearken to your verdict as the court hath recorded it. You say that ――― is guilty (or not guilty) of the matter whereof he stands indicted, and so say you all." 76 Md. at 487. Although the Court in *Givens* used the words "guilty" and "not guilty" in the hearkening, we are again of the view that the Court did not mandate the use of specific words in the hearkening of the verdict. Because of the failure to hearken the verdict in *Givens*, the Court held that hearkening must be conducted; it did not dictate a required form for the hearkening. *See id.* at 488. Further, the other cases cited by the Court in *Givens* do not state that the hearkening requires the use of the words "guilty" or "not guilty." *See Com. v. Gibson*, 4 Va. 70, 70 (Va. Gen. Ct. 1817) ("After a verdict in Felony has been received and read, it is the duty of the Clerk to direct the jury to

15

hearken to their verdict, as the Court has recorded it: then to repeat it to them, and poll them, or say, 'And so say you, all,' or words to that effect[]").

In *Glickman v. State*, 190 Md. 516 (1948), the appellant contended that the hearkening of the verdict was ineffectual "because the Clerk omitted the words 'as the court hath recorded it.'" *Id.* at 527. The Supreme Court of Maryland rejected the appellant's contention, holding that the omitted words were "a mere matter of immaterial form. The important matter of substance is that *all the jurors assented to the verdict in the manner in which it had been stated by the foreman and accepted by the Court*." *Id.* (Emphasis added); *Smith*, 299 Md. at 165 n.5 (same). Similarly, in *Santiago*, the Court stated that "[t]he reason that hearkening, in the absence of polling, is essential lies in the defendant's constitutional right to a unanimous verdict, and the concept of finality with respect to jury verdicts. . . . *Accordingly, the jury is asked to hearken to the verdict as delivered by the foreman*." 412 Md. at 37-38 (footnote omitted) (emphasis added).

When announcing the verdict in the instant case, the foreperson stated "yes" as to each count. In order to keep the form between the announcement and the hearkening the same, the trial court interrupted the clerk at the beginning of the hearkening to ensure that the clerk said "yes" instead of "guilty." The clerk proceeded to say "yes" as to each count. Because, according to *Smith*, the substantive aspect of hearkening is ensuring that jurors have an opportunity to assent to the verdict as it was announced by the foreperson, the hearkening in this case fulfilled that purpose and thus was valid. *See Smith*, 299 Md. at 165 n.5.

16

Appellant also argues that the form of the hearkening given by the clerk had a "dimension of ambiguity" because saying "yes" made it unclear whether the jury was referring to the appellant or Miles, the passenger in appellant's vehicle. In *Smith*, the Court stated that if a verdict is ambiguous, then "'it is the duty of the trial judge to call the jury's attention to the defect and to direct them to put the verdict in proper form either in the presence of the court or by returning to their consultation room for the purpose of further deliberation.'" *Smith*, 299 Md. at 170 (quoting *Glickman*, 190 Md. at 525). In *Ogundipe*, the Court stated that, although the verdict sheet did not constitute the jury's verdict, the verdict sheet "did not evidence any confusion by the jury as to the charges." 424 Md. at 73.

Here, there is no indication that the trial judge thought that the verdict was in any way ambiguous. Although the trial judge stated that he was "confused," his confusion related to the form of the announcement and hearkening and not as to whether the jury thought that the appellant was guilty as to all charges. Furthermore, unlike *Ogundipe*, there were no inconsistencies between the verdict sheet and the announced verdict, and thus no confusion by the jury or the trial court as to the charges. *See Ogundipe*, 424 Md. at 73. Finally, Miles was not a co-defendant, as appellant was the only defendant in this case. We are confident that the jurors were aware that each of the counts announced by the foreperson applied to appellant and appellant only. Because the jury foreperson properly

announced the verdict, and the hearkening and polling confirmed the jury's verdict, we hold that the rendition of the jury's verdict was valid.[4]

## II.  *Voir Dire* Question

### A.  Facts

On November 29, 2021, at 9:03 a.m., the trial court began the *voir dire* process. The first venire consisted of 38 potential jurors numbered between 220 and 334. The court asked a number of questions to the venire, ending with a final question: "Do any of you have any reason whatsoever why you cannot sit as a juror in this case and render a fair and impartial verdict based on the evidence and the law?" The court then asked counsel if they had any objections to the *voir dire* questions, to which defense counsel responded, "no objections." At 11:17 a.m., after receiving the jurors' responses individually and dismissing a number of jurors for cause, the trial judge determined that additional potential jurors would be required in a second venire.

At 1:55 p.m., the trial court resumed the *voir dire* process with a second venire, asking the same questions as posed to the first venire. Before the court asked the final question, however, defense counsel approached the bench and stated:

---

[4] Appellant argues, in the alternative, that "this Court should find that trial counsel rendered ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984)." Appellant explains that "by failing to preserve the issue, counsel deprived [a]ppellant of appellate review of an issue that had a reasonable probability of succeeding on appeal." Because we have addressed appellant's issue regarding the rendition of the jury's verdict, there can be no ineffective assistance of counsel claim based on defense counsel's waiver or failure to preserve the issue for our review. In other words, appellant's ineffective assistance of counsel claim on this issue is moot. *See* footnote 3, *supra*.

[DEFENSE COUNSEL]: There was a question that I wanted last time that I didn't have asked, it's about *whether anybody has a medical condition that would cause them to be unable to sit and listen to the jury* [sic].

THE COURT: I think that would fall under the last question.

[DEFENSE COUNSEL]: Okay. All right.

(Emphasis added). The trial court's final question, which was asked immediately after the preceding interaction, was as follows:

THE COURT: All right. Ladies and gentlemen, here's the last question. So if there's something you thought you should respond to, but for whatever reason didn't, please respond to this one. *Do you know of any reason whatsoever why you cannot sit as a juror in this case and render a fair and impartial verdict based on the evidence and the law?*

(Emphasis added). Three jurors responded to the question, none of whom raised a medical condition. The jury was sworn just before 4:30 p.m.

## B. Arguments of the Parties

Appellant argues that the trial court abused its discretion by failing to ask defense counsel's proposed question. Specifically, appellant asserts that the question "was directed at a statutory cause for disqualification[,]" namely a certified disability that prevents an individual from providing satisfactory jury service. Appellant also claims that the court's final question was not an adequate substitute for his requested question, and was, in any event, "an improperly phrased compound question."

The State responds that the trial court appropriately exercised its discretion in declining to ask appellant's proposed *voir dire* question. According to the State, "[w]hereas [appellant] now describes that request as having sought a 'statutory cause for disqualification,' the question his counsel *actually* sought asked only about 'medical

19

issues' that could make a juror unable to sit through the trial." (Emphasis in original).

Further, the State contends that the trial court correctly believed that appellant's requested question was covered by the court's final question. The State also points to the fact that defense counsel raised the requested question only for the second venire panel, and thus the question was "almost an afterthought[.]" Finally, the State contends that "any error in the court's declining to pose the question was harmless."

### C. Standard of Review

Decisions of a trial court during *voir dire* are generally reviewed under an abuse of discretion standard. *See Thomas v. State*, 454 Md. 495, 504 (2017). The "standard is whether the questions posed and the procedures employed have created a reasonable assurance that prejudice would be discovered if present." *Washington v. State*, 425 Md. 306, 313 (2012). In order to make this determination, "an appellate court looks at the record as a whole to determine whether the matter has been fairly covered." *Id.* at 313-14. Failure of a trial court to ask a mandatory question upon request is an abuse of discretion. *See Curtin v. State*, 393 Md. 593, 609 n.8 (2006).

### D. Analysis

The Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights grant a defendant a right to an impartial jury. U.S. Const. amend. VI; Md. Const. Decl. of Rts. art. 21. *Voir dire* "'is critical to' implementing the right to an impartial jury." *Pearson v. State*, 437 Md. 350, 356 (2014) (quoting *Washington*, 425 Md. at 312). In Maryland, "the sole purpose of voir dire is to ensure a fair and impartial jury by determining the existence of cause for disqualification[.]" *Washington*, 425 Md. at

20

312. Trial judges have "broad discretion in the conduct of *voir dire*, especially regarding the scope and form of the questions propounded, and that he or she need not make any particular inquiry of the prospective jurors unless that inquiry is directed toward" that purpose. *Thomas*, 454 Md. at 504. "On request, a trial court must ask a *voir dire* question if and only if the *voir dire* question is 'reasonably likely to reveal [specific] cause for disqualification[.]'" *Pearson*, 437 Md. at 357 (quoting *Moore v. State*, 412 Md. 635, 663 (2010) (alteration in original). The two categories of specific causes for disqualification are "(1) a statute disqualifies a prospective juror; or (2) a 'collateral matter [is] reasonably liable to have undue influence over' a prospective juror." *Id.* (quoting *Washington*, 425 Md. at 313).

Appellant's proposed *voir dire* question was "whether anybody has a medical condition that would cause them to be unable to sit and listen to the jury [sic]." Appellant first argues that such question was likely to elicit disqualifying information about whether any potential juror had a certified disability. Appellant's argument is not persuasive.

Section 8-103(b)(3) of the Courts and Judicial Proceedings Article provides, in relevant part:

> (b) Notwithstanding subsection (a) of this section and subject to the federal Americans with Disabilities Act, an individual is not qualified for jury service if the individual:
>
> \*\*\*
>
> (3) Has a disability that, as documented by a health care provider's certification, prevents the individual from providing satisfactory jury service[.]

Md. Code Ann., Cts. & Jud. Proc. § 8-103(b)(3) (footnote omitted). Appellant's proposed

*voir dire* question, which asks about any "medical condition," makes no reference to "a

disability" that is "documented by a health care provider's certification[.]" Thus appellant's

question is unlikely to reveal statutory disqualifying information. Moreover, defense

counsel never advised the trial court that the requested question was intended to elicit a

statutory basis for disqualifying a juror.

In denying defense counsel's requested *voir dire* question, the trial court ruled that

the final *voir dire* question would cover defense counsel's question. The final *voir dire*

question, often referred to as the "catch-all" question, was: "Do you know any reason

whatsoever why you cannot sit as a juror in this case and render a fair and impartial verdict

based on the evidence and the law?" Appellant argues that the court's catch-all question

was not an "adequate substitute" for his proposed *voir dire* question, citing *Davis v. State*,

333 Md. 27, 47 (1993), *overruled on other grounds by Pearson*, 437 Md. at 368.[5] We

disagree and shall explain.

Although the trial court's catch-all question did not specifically refer to a "medical

condition" as a reason for an individual's inability to sit as a juror, the question did ask for

"any reason" why a prospective juror could not sit as a juror. "Any reason" clearly includes

a "medical condition" and thus the court correctly ruled that appellant's proposed question

was covered by the court's catch-all question. Furthermore, *Davis* does not compel a

---

[5] Appellant also argues that defense counsel's statement, "Okay. All right[,]" after the trial court's ruling did not constitute acquiescence to that ruling, and thus did not waive appellant's right to challenge the ruling on appeal. *See* Md. Rule 4-323(c). Because we have chosen to review the trial court's ruling, appellant's argument is moot.

different result. In *Davis*, our Supreme Court stated that a general *voir dire* question, "such as, 'is there any reason why you could not render a fair and impartial verdict,' is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and impartially decide the case." 333 Md. at 47. Here, unlike in *Davis*, appellant's question did not seek to uncover any biases that could hinder a potential juror's ability to render a fair and impartial verdict. Instead, appellant's question sought only a specific reason, i.e., any medical condition, that would prevent a potential juror from sitting on the jury.

Regarding the trial court's catch-all *voir dire* question, appellant also complains that such question is an "improperly phrased compound question." Appellant is wrong, not just because the catch-all question is not an improper compound question, but because appellant never preserved the issue for appellate review.

Writing for this Court in *Robson v. State*, 257 Md. App. 421, *cert. denied*, 483 Md. 520 (2023), Judge Charles E. Moylan, Jr., stated that "[t]o preserve successfully for appeal 'any claim involving a trial court's decision about whether to propound a voir dire question, a defendant must object to the court's ruling.'" *Id.* at 459 (quoting *Foster v. State*, 247 Md. App. 642, 647 (2020)). In *Robson*, the challenged *voir dire* questions were concededly improper compound questions. *Id.* at 457; *see Dingle v. State*, 361 Md. 1, 3-4, 17 (2000) (holding improper a compound *voir dire* question, i.e., a question inquiring about certain experiences or associations of a potential juror coupled with an inquiry into whether the experience or association would affect the juror's ability to be fair and impartial); *accord*, *Pearson*, 437 Md. at 362-63. In holding that the appellant's challenge to the forbidden

23

compound questions had not been preserved for appellate review, Judge Moylan noted that "[t]o neither the representative compound question now being considered nor to any of the five allegedly compound questions which the appellant challenges was there raised so much as a murmur of objection during the voir dire examination." *Robson*, 257 Md. App. at 459.

Similar to the facts in *Robson*, there is nothing in the record in the instant case that shows appellant objected to the trial court's catch-all question as an improper compound question. Indeed, when the court gave the same catch-all question to the first venire,[6] defense counsel stated that he had "no objection" to any of the *voir dire* questions. Therefore, we conclude that appellant's challenge to the trial court's catch-all question as an improper compound question is not preserved for appellate review.

Even if preserved, however, appellant's challenge to the trial court's catch-all question would not prevail. Simply stated, the catch-all question is not an improper compound question.

An example of an improper compound question is: "Does any member of the panel hold such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts of this trial where narcotics violations have

_____

[6] The catch-all question to the first venire was, "Do *any of you have* any reason whatsoever why you cannot sit as a juror in this case and render a fair and impartial verdict based on the evidence and the law?" The catch-all question to the second venire was "Do *you know of* any reason whatsoever why you cannot sit as a juror in this case and render a fair and impartial verdict based on the evidence and the law?" The only difference is the italicized portion, which we view as immaterial.

been alleged?" *Pearson*, 437 Md. at 361. In *Robson*, Judge Moylan expounded on the

concept of an improper compound question in the context of a *voir dire* examination:

> **A compound question, in this <u>Dingle-Pearson</u> analysis, consists of two parts which are very different in their basic nature and function. The first part is the "protasis" or the "conditional clause."** It addresses the "potential existence of a specified condition." **The second part addresses "the potential effect of the specified condition," if that condition exists. That second or consequential part is the "apodosis," or the "conclusion clause."** The apodoses tend to "remain constant," always yielding a simple "Yes" or "No." The protases, by contrast, are widely variable, "relative to each particular experience or association of concern." **It is the protasis that identifies the actual condition that might represent a challenge for cause**. The apodosis represents only what the prospective juror believes would be his or her response to such a condition.

257 Md. App. at 450 (emphasis added).

Judge Moylan went on to identify the "negative answer, the non-response," as "the

problem." *Id.* at 453. He wrote:

> A negative answer to the apodosis, signified only by the juror's continuing to sit silent, tells us nothing. What does, "No, I can be impartial" mean? Does it mean, "No. Notwithstanding the existence of the circumstance you ask about, I can overcome that and still be fair and impartial?" Or does it mean, "No, I can be impartial because the circumstances you asked about do not even exist in my case and there is no reason, therefore, why I cannot be fair and impartial?" The unspoken answer to the apodosis will be "No" regardless of whether the unspoken answer to the protasis would have been "Yes" or "No." Even in the face of a tentative challenge for cause, it would have been the prospective juror himself rather than the trial judge who made the ultimate decision as to whether a challenge for cause existed.

*Id.* at 453-54.

As previously stated, the trial court's catch-all question in the instant case was: "Do

you know of any reason whatsoever why you cannot sit as a juror in this case and render a

fair and impartial verdict based on the evidence and the law?" Although the catch-all

question has two parts, the first part is not a "conditional clause" and the second part is not a "conclusion clause." The two parts are separate and independent of each other. They are, in reality, two different questions put together by the conjunction "and." More importantly, a negative answer, or non-response, provides all of the information requested by the question, *i.e.* the prospective juror does not know of any reason why he or she cannot sit as a juror, and the juror does not know of any reason why he or she cannot render a fair and impartial verdict based on the evidence and the law.

Finally, even if the trial judge erred in not asking defense counsel's proposed question, the error was harmless. In a criminal case, an error is harmless only if a court finds that the error was "harmless beyond a reasonable doubt." *Gross v. State*, 481 Md. 233, 257 (2022). In other words, "the State must show beyond a reasonable doubt that the 'evidence admitted in error in no way influenced the verdict.'" *Id.* at 259 (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). Where "a 'reviewing court, upon its own independent review of the record, is [un]able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated.'" *Moore*, 412 Md. at 666 (alteration in original) (quoting *Dorsey*, 276 Md. at 659).

In the instant case, appellant points to no evidence that any juror had a medical condition that prevented him or her from sitting on the jury, and no juror raised a medical condition in response to the court's final catch-all question. More importantly, all twelve jurors selected by the parties sat through the entire trial, participated in jury deliberations, and rendered a verdict on all eighteen charges. The alternate juror was excused before the

jury began its deliberations. Therefore, there is no evidence that any juror failed to sit as a juror for the entire trial or was otherwise unable to provide "satisfactory jury service[.]" Md. Code, Cts. & Jud. Proc. § 8-103(b)(3).

### III. Accomplice Liability Instruction

### A. Facts

After the close of the evidence and before closing arguments, the trial court instructed the jury that appellant may be found guilty of the crime of possession with intent to distribute as an accomplice. The court stated:

> The Defendant may be guilty of the crime of possession with intent to distribute as an accomplice even though the Defendant did not personally commit the acts that constitute the crime. In order to convict the Defendant of possession with the intent to distribute as an accomplice, the State must prove that the possession was with the intent to distribute occurred and that the Defendant with the intent to make the crime happen, knowingly aided, counseled, commanded or encouraged the commission of the crime or communicated to a participant in the crime that he was ready, willing, and able to lend support if needed.
>
> The mere presence of the Defendant at the time and place of the commission of the crime is not enough to prove that the Defendant is an accomplice. If presence at the scene of the crime is proven, that fact may be considered along with all of the surrounding circumstances in deciding or determining whether the Defendant intended to aid, participate and communicated that willingness to a participant.

At the end of the jury instructions, appellant objected to this instruction on the basis that the evidence did not warrant the instruction. The trial court declined to withdraw the instruction.

In his closing argument, the prosecutor explained to the jury the relevance of the accomplice liability instruction in relation to the facts of the instant case:

27

Now, the Judge also gave you another instruction on accomplice liability. So you may say, you know, I'm not sure if he actually had the drugs on him. I'm not sure if he constructively possessed them, but the accomplice liability instruction that the Judge gave you and that you'll get in the jury room is that if you are assisting in the commission of a crime, you're culpable. Why did [appellant] take off? Why did he take off? They're either his drugs that were thrown out the window, which I would submit to you the circumstantial evidence shows that they were his drugs, or he was helping somebody who was possessing them with intent to distribute. Under either circumstance, [appellant] is culpable for that crime.

## B. Arguments of the Parties

Appellant claims that the State can use appellant's actions after the initial traffic stop only as evidence that appellant was an accessory after the fact, not an accomplice to a crime. Appellant argues that none of the "pre-stop" actions attributed to appellant show that appellant aided "another's commission of possession with intent to distribute[.]" Specifically, appellant asserts that (1) there was no "pre-stop" evidence "of an 'actual perpetrator' other than [a]ppellant[,]" and (2) appellant's purported joint-possession of the same controlled dangerous substances as Miles does not show that appellant aided or encouraged Miles's commission of a crime; in other words, "[p]ossession by appellant is redundant." Therefore, according to appellant, the accomplice instruction was not generated by the evidence.

The State responds that the jury instruction on accomplice liability "was proper as generated by the evidence: the jury could have found that the passenger in the car, Miles, possessed controlled dangerous substances with intent to distribute, and that [appellant] aided in and encouraged commission of that crime." The State points to evidence that Miles at some point possessed the controlled dangerous substances, "given that he threw it out

28

the window," that appellant was aware of the drugs by the presence of the scale and phones in plain view, and that appellant tried to flee from the police after stopping the car. Because, according to the State, only "some evidence" is required, the accomplice liability instruction was properly generated. Lastly, the State contends that "[a] court may instruct on alternate theories of liability where the evidence supports each theory."

### C. Standard of Review

Decisions of a trial court to give a jury instruction are reviewed under an abuse of discretion standard. *See Nicholson v. State*, 239 Md. App. 228, 239 (2018).

### D. Analysis

Maryland Rule 4-325(c), which governs how trial courts are required to deliver jury instructions, states:

> **How given.** The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

In *Ware v. State*, the Supreme Court of Maryland explained that Rule 4-325(c) requires the trial court to give a requested jury instruction when: "(1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction[s] actually given." 348 Md. 19, 58 (1997). Further, "[i]f a party requests an instruction . . . the trial judge should first evaluate whether the evidence

adduced at trial suggests the need for the requested instruction." *Gunning v. State*, 347 Md. 332, 348 (1997).

The party requesting a jury instruction "must only produce some evidence to support the requested instruction." *Rainey v. State*, 252 Md. App. 578, 591 (2021), *aff'd*, 480 Md. 230 (2022) (internal quotation marks omitted). A determination of the sufficiency of the evidence is assessed "in the light most favorable to the requesting party." *Rainey*, 480 Md. at 255. Such determination requires an appellate court to "independently determine whether the requesting party . . . 'produced [the] minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.'" *Id.* (quoting *Bazzle v. State*, 426 Md. 541, 550 (2012)).

At the outset, we reject appellant's assertion that "any actions attributed to [a]ppellant from the point in time of the initial stop forward are relevant only with respect to a charge of being an accessory after the fact." Appellant is under the misapprehension that the possession of illegal drugs with the intent to distribute by Miles somehow ended at the time of the initial stop, and thus appellant could not be convicted as an accomplice based upon what happened after the initial stop. According to appellant, he could only be charged with being an accessory after the fact, which he was not. In our view, the evidence supported the crime of possessing controlled dangerous substances with the intent to distribute by Miles *after* the initial stop because the illegal drugs, scale, and phones were in the vehicle when appellant drove away, and Miles was in possession of the drugs when he threw them out of the window. Therefore, appellant's actions after the initial stop are

relevant as to whether appellant was an accomplice to Miles's possession of CDS with the intent to distribute. Appellant points to no authority supporting his claim that appellant's actions after the initial stop cannot be used to prove that appellant was an accomplice to a crime committed by Miles.

Considering the evidence both before and after Deputy Nolan initially stopped appellant's vehicle, there is "some evidence" to support the jury instruction on accomplice liability and raise the inference that appellant was aiding Miles in the possession of narcotics with the intent to distribute. First, Miles was in the same car as appellant, and appellant was the one who fled the scene of the initial stop by speeding away from Deputy Nolan. Second, Miles was in actual possession of the drugs at least for a short period when he threw them out the window. Third, a scale with CDS residue on it was recovered in the open center console of the vehicle, meaning that it was in plain view of appellant while he was driving. It is a reasonable inference for the jury to make that Miles was the one in possession of the scale and the narcotics recovered from the shoulder of the road, and thus appellant was aiding him in the possession and distribution of those narcotics by fleeing from the police after the initial stop. Further, the State is permitted to present and argue alternate theories of liability. *See, e.g., Selby v. State*, 76 Md. App. 201, 207 (1988), *aff'd* 319 Md. 174 (1990); *Cruz v. State*, 407 Md. 202, 222 (2009). Therefore, the trial court did not abuse its discretion by giving the jury instruction on accomplice liability.

# IV. Acceptance of the State's Witness as an Expert

## A. Facts

At trial, Deputy Nolan was called by the State as an expert in "[t]he identification, packaging, distribution of controlled dangerous substances including the amounts, usages, values, packaging, modus operandi, techniques, activities, and schemes of drug traffickers." Deputy Nolan testified that he received narcotics training at a week-long course at the police academy in 2016, which covered the packaging, quantity, street value, and slang terms of CDS. According to Deputy Nolan, he had been involved in twenty-six narcotics investigations over the previous five years, including investigations involving cocaine, heroin, and fentanyl. In addition, Deputy Nolan testified that he had spoken with individuals whom he had arrested, as well as others, about slang terms for various substances over the previous five years.

The trial court allowed defense counsel to *voir dire* Deputy Nolan, during which Deputy Nolan testified that he has no specialized training in the identification, packaging, or distribution of CDS and had never previously been accepted as an expert witness in a court in Maryland. Following the *voir dire*, defense counsel objected to the acceptance of Deputy Nolan as an expert in the proffered fields, and the court stated as follows:

> THE COURT: I'm going to deny the request to recognize him as an expert for what you previously proffered in that. **If you're offering him as an expert in slang or street terminology and/or street value, then I will qualify him as an expert in those limited fields.**[7]

---

[7] The trial court then allowed defense counsel to conduct additional *voir dire* in the fields of street terminology and value of CDS, and in response to defense counsel's question about cell phones, Deputy Nolan testified that in the course of his work over the previous

Continued

(Emphasis added.)

Regarding the facts of the instant case, Deputy Nolan testified that four phones were recovered from appellant's vehicle, two of which had evidentiary value, and that he took photographs of text messages on those two phones. Deputy Nolan then testified as to the meaning of various slang terms in those text messages.

## B. Arguments of the Parties

Appellant argues that the trial court abused its discretion by accepting Deputy Nolan as an expert because the instant case was the first time that Deputy Nolan had been accepted as an expert by a court, he had no specialized training in narcotics enforcement, and his only narcotics training was a week-long course in the police academy that occurred six years prior to appellant's arrest. Although Deputy Nolan had been a patrol officer since leaving the academy, appellant argues that Deputy Nolan was not qualified as an expert because he had "only participated in eight cases involving heroin and fentanyl and six cases involving cocaine[,]" and only had experience in interpreting text conversations related to illegal drugs on approximately two cellphones.

The State responds that "Deputy Nolan's qualifications, training, and experience qualified him in the areas where the court accepted him[.]" Specifically, the State argues that the week-long class Deputy Nolan took at the police academy "covered the packaging

_____

five years he looked at approximately two phones to determine whether they were drug related. Defense counsel re-raised his objection, but the court recognized Deputy Nolan as "an expert in the fields of slang or street terminologies, controlled dangerous substances and street value of controlled dangerous substances."

of narcotics, and the amount of CDS typically found on a user versus a distributor." The State also points to the fact that Deputy Nolan was involved in the investigation of twenty-six narcotics cases and had talked with suspects about street terms and terminology. Finally, the State contends that appellant's attacks on the length of time Deputy Nolan had been on patrol and the fact that he had never previously been admitted by a court as an expert go to the weight, rather than the admissibility, of his testimony.

### C. Standard of Review

Decisions by a trial court to admit a witness as an expert are reviewed under an abuse of discretion standard. *See Frankel v. Deane*, 480 Md. 682, 701 (2022). A trial court's decision whether to admit expert testimony is also discretionary. *Sissoko v. State*, 236 Md. App. 676, 712 (2018). A trial court's ruling to admit expert witness testimony "'will seldom constitute a ground for reversal.'" *State v. Matthews*, 479 Md. 278, 306 (2022) (quoting *Rochkind v. Stevenson*, 471 Md. 1, 10 (2020)). A trial court's decision warrants reversal only when it is "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Id.* at 305 (quoting *Devincentz v. State*, 460 Md. 518, 550 (2018)).

### D. Analysis

A trial judge "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see Rochkind*, 471 Md. at 31. This gatekeeping function applies "not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141

34

(1999); *see Rochkind*, 471 Md. at 36, 38. Maryland Rule 5-702, which governs the admissibility of expert testimony, states:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine
> (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education,
> (2) the appropriateness of the expert testimony on the particular subject, and
> (3) whether a sufficient factual basis exists to support the expert testimony.

Md. Rule 5-702.

For a witness to qualify as an expert under subsection (1), the witness "must have special knowledge of the subject so that the expert 'can give the jury assistance in solving a problem for which [its] equipment of average knowledge is inadequate.'" *Samsun Corp. v. Bennett*, 154 Md. App. 59, 67-68 (2003) (quoting *Baltimore Gas & Electric Co. v. Flippo*, 112 Md. App. 75, 98 (1996)) (alteration in original). A witness may be allowed to give an expert opinion if they are "'reasonably familiar with the subject under investigation, regardless of whether this special knowledge is based upon professional training, observation, actual experience, or any combination of these factors.'" *Roy v. Dackman*, 445 Md. 23, 41 (2015) (quoting *Radman v. Harold*, 279 Md. 167, 169 (1977)). An expert witness "need not possess special knowledge if he or she is generally conversant with the subject of the controversy." *Bennett*, 154 Md. App. at 68.

In the instant case, the trial court did not abuse its discretion in admitting Deputy Nolan as an expert. Appellant cites to no Maryland case law in support of his argument that the acceptance of Deputy Nolan as an expert was an abuse of discretion. Although

Deputy Nolan's only official training on illegal drugs was a week-long course at the police academy, his experience working on patrol for five years and conducting twenty-six narcotics investigations during that time period, fourteen of which involved heroin, fentanyl, and/or cocaine, provided evidence that he was "'reasonably familiar with the subject under investigation[.]" *Dackman*, 445 Md. at 41. In addition, although Deputy Nolan may not have specialized training in narcotics enforcement and street terminology of CDS, the trial court did limit his expert designation to specific, narrow fields consistent with his experience as a patrol officer. The decision to allow Deputy Nolan to testify as an expert thus was not "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Matthews*, 479 Md. at 305 (internal quotation marks omitted). Accordingly, the trial court did not abuse its discretion in accepting Deputy Nolan as an expert witness.

**JUDGMENTS OF THE CIRCUIT COURT FOR KENT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

Circuit Court for Kent County
Case No.: C-14-CR-21-000024

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 28

September Term, 2022

_____

CAMERON DARNELL LEWIS

v.

STATE OF MARYLAND

_____

Arthur,
Friedman,
Woodward, Patrick, L.,
  (Senior Judge, Specially Assigned),

JJ.

_____

Concurring Opinion by Friedman, J.

_____

Filed: June 27, 2024

I concur in the majority's opinion and join its analysis with regards to Sections I-III of its opinion. I write separately only to identify my concerns with respect to Deputy Nolan's expert testimony as discussed in Section IV of the majority's opinion. As I explained in my concurrence in *Ingersoll v. State*, I am very skeptical of the State's use of law enforcement officers as experts in the sociology of the criminals that they try to arrest. *Ingersoll v. State*, ---- Md. App. ---- (filed May 31, 2024) (Friedman, J. concurring). Wile E. Coyote is simply not an expert in the sociology of roadrunners.

Despite this, I do not think that the trial court erred in admitting Deputy Nolan "as an expert in slang or street terminology and/or street value." Slip Op. at 32 (quoting Transcript). I think that Deputy Nolan had the "skill, experience, training, [and] education" to testify on these subjects. *See generally, Ragland v. State*, 385 Md. 706 (2005). Some of the questions asked, and Deputy Nolan's responses, however, suggest that a tighter judicial leash is necessary to ensure that expert testimony by law enforcement officers is appropriate and appropriately confined. *See Ingersoll*, Slip Op. at 47 n.8 (Friedman, concurring) (describing that law enforcement officer expert testimony regarding gang vernacular "often matches—quite precisely—the meaning needed to convict."). Two examples from this case demonstrate my point.

In the first example, State's Exhibit 5 was shown to Deputy Nolan. It is a picture of a text message in which someone asks Lewis: "How much did you say for 50?" And Lewis responds "325." Deputy Nolan gave his expert testimony that "in this case, 50 is an amount or quantity of some kind of drug and 325 would be a response, which would be a dollar amount." Without Deputy Nolan assuming that Lewis is a drug dealer, nothing about this

text exchange identifies it as a drug transaction. A purchaser asks to be quoted a price for 50 units and the seller says $325 dollars (or $6.50 per unit). It could be tomatoes or turnips. Or it could be heroin. But Deputy Nolan—expert or not—has no way to know which it is.

The second example is even worse:

| | |
|---|---|
| State's Attorney: | Deputy, do you see any slang or coded language in this exchange? |
| Deputy Nolan: | I don't see any slang. I just see who – the person who sent is saying, "Hey, are you good?" |
| State's Attorney: | And have you seen that phrase before – |
| Deputy Nolan: | Yes. |
| State's Attorney: | -- in the context of drug transactions? |
| Deputy Nolan: | Yes. It's just – ***it looks like someone who's selling drugs checking on somebody that they sell it to to see if they need more.*** |

(Emphasis added). I don't think that is expert testimony at all. The text could have meant precisely what it said; one person asking if another is okay. I probably have a text just like it on my phone. Deputy Nolan's testimony proceeds from the assumption that he and the State were trying to prove—that Lewis is a drug dealer.

These questions and Deputy Nolan's answers to them were not objected to and are not preserved for appellate review. MD. R. 8-131(a); *Nalls v. State*, 437 Md. 674, 691 (2014). Nonetheless, it suggests that careful control must be exercised to ensure that when accepted, expert testimony is carefully confined to topics about which the experts have expertise.

I concur.